IN RE INTEREST OF BRITTANY C. ET AL.,
CHILDREN UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE,
v. NONA M., APPELLANT.
693 N.W.2d 592

Filed March 15, 2005. Nos. A-04-820 through A-04-826.

Richard L. DeForge, Deputy Scotts Bluff County Public Defender, for appellant.

No appearance for appellee.

CARLSON, MOORE, and CASSEL, Judges.

CASSEL, Judge.

## INTRODUCTION

Nona M. appeals the orders of the Scotts Bluff County Court, sitting as a juvenile court, denying her requests to transfer jurisdiction to a tribal court and argues that such orders are appealable. We agree that the denials of her requests were final, appealable orders supplying this court with jurisdiction to consider the

appeal, but we find no abuse of discretion in the trial court's refusal to transfer jurisdiction. Accordingly, we affirm.

## BACKGROUND

Nona is the biological mother of Brittany C., Jessica C., Alonzo C., and Michael M., Jr. At the time of the relevant hearing, the ages of the children were 12, 10, 8, and 9, respectively.

The seven proceedings with regard to these children were consolidated below and again consolidated before us on appeal. Case No. A-04-821 arises out of the December 8, 2003, petition which alleged that Brittany was a truant and thus a child within the meaning of Neb. Rev. Stat. § 43-247(3)(b) (Cum. Supp. 2002). Case No. A-04-822 involves a December 19 petition which alleged that Jessica was neglected and a truant and which requested that she be adjudicated as a child within the meaning of § 43-247(3)(a) and (b). Case No. A-04-825 is based upon a December 19 petition which alleged that Michael was neglected and a truant and which requested that he be adjudicated as a child within the meaning of § 43-247(3)(a) and (b). Cases Nos. A-04-820, A-04-823, A-04-824, and A-04-826 arise out of petitions filed on March 2, 2004, which alleged that Brittany, Alonzo, Jessica, and Michael each lacked parental care and which requested that each be adjudicated as a child within the meaning of § 43-247(3)(a).

Because the children were eligible for enrollment in the Oglala Sioux Tribe, the State sent notice to the Oglala Sioux Tribe, pursuant to the Nebraska Indian Child Welfare Act (ICWA), that petitions involving these children had been filed. On March 5, 2004, Nona applied to enroll the children with the Oglala Sioux Tribe. The trial court placed temporary custody of the children with the Nebraska Department of Health and Human Services (DHHS) for foster care placement, and on March 9, the children were placed with non-Native American families.

In May 2004, the tribe filed motions to intervene in these matters. On June 3 and 14, the court held a hearing on the tribe's requests to intervene and the State's objection to such requests. We recognize that pursuant to Neb. Rev. Stat. § 43-1504(3) (Reissue 2004), an Indian child's tribe has the right to intervene at any point in a state court proceeding for the foster care placement of, or termination of parental rights to, that Indian child. Although

we find no motion for transfer in the record, it is evident that the court and the parties treated the hearing on the tribe's requests to intervene as a hearing on the transfer of the cases to tribal court. On a different note, we observe that during the hearing, Nona's attorney requested the court to take judicial notice "of the documents filed on behalf of the tribe to intervene in this case" and "the documents filed in the files of the court indicating that the children are now registered members of the Oglala tribe," and that the court agreed to take judicial notice "of those files and that documentation." Unfortunately, these documents were not made part of the record.

> "Papers requested to be noticed must be marked, identified, and made a part of the record. Testimony must be transcribed, properly certified, marked and made a part of the record. Trial court's ruling . . . should state and describe what it is the court is judicially noticing. Otherwise, a meaningful review is impossible."

*In re Interest of C.K., L.K., and G.K.*, 240 Neb. 700, 709, 484 N.W.2d 68, 73 (1992), quoting *In Interest of Adkins*, 298 N.W.2d 273 (Iowa 1980). Because the matters judicially noticed do not appear to be disputed, we do not believe that the failure to include these documents in the record requires reversal and remand in these cases.

At the time of the hearing, Nona lived in Scottsbluff with her two younger children, who are not subject to these proceedings, and the father of those children. Nona lived on an Indian reservation when she was younger, but has lived in Scotts Bluff County since 1984. Nona's mother and at least five of Nona's siblings also live in Scottsbluff. Nona testified that she has aunts, uncles, cousins, and grandmothers living on the reservation. She planned to move to Martin, South Dakota, and live there with one of her brothers until she could find a residence of her own.

Nona testified that prior to 2002, her children had never lived on the Oglala Sioux reservation, but had gone camping there. Nona testified that since her children were returned to her in 2002, she had been taking them to visit the reservation three or four times a month. She testified that Michael learned how to dance and tries to sing Native American songs. Nona testified that she sought intervention by the tribal court because she felt her children would

be safer with the involvement of the Oglala Nation Tiyospaye Resource and Advocacy Center (ONTRAC), a program to implement the ICWA, and by their being transferred to the reservation. She felt that the tribal court's intervention would be in the best interests of her children because she wanted her children to stay together and to learn their culture. Nona testified that her children love the reservation.

Mariah Provost, a family preservation coordinator for ONTRAC, sent the motions to intervene in these cases. She first became acquainted with Nona on March 5, 2004, when Nona requested assistance from ONTRAC. Provost testified that Nona's children are eligible to be enrolled with the tribe, but that the enrollment council meets every 3 to 6 months and had not yet met in consideration of the children at the time of the hearing. When asked why the tribe was interested in intervening, Provost stated that "ONTRAC can assist this family with services in providing for improving their home functioning, family functioning, [and] parenting functioning." She testified that the beneficial effects living within the tribe can have on Native American children are that they maintain family ties, culture, and "[t]iyospaye" (which means extended family ties), along with receiving educational and medical services. Provost also testified that an Indian health service on the reservation can provide services for Alonzo, who has Duchenne's muscular dystrophy and needs special care. According to Provost, Nona was willing to cooperate with ONTRAC and, as noted above, move to Martin.

Provost testified that the Oglala tribal court is approximately "two hours" from the Scotts Bluff County courthouse. When asked whether she was aware of any mechanism to subpoena witnesses or to have witnesses from Scotts Bluff County appear in the tribal court, Provost answered, "The only person that contacted me was Alonzo's — she works with him at school." Provost was subsequently asked a similar question, to which Provost answered, "The youth and family court clerk will notify all people involved and I think they give 'em like — they send out notices, set a two-week court date, something like that." When asked whether the tribal court could call witnesses from other states, Provost testified, "Not in any of my cases that I've worked with whether it be social services or ONTRAC."

Nan Carver, a protection and safety worker with DHHS, testified that she did not know anything about the father of Brittany and Alonzo beyond his identity, that Jessica believed her father lived somewhere in Iowa, and that Carver knew the identity of Michael's father. DHHS initially became involved with Nona's family in 1998 due to concerns of neglect and a roach infestation of the home of Nona's mother, in which the family and other relatives resided. The children were removed from Nona's custody on January 9, 1998, and returned to her custody one at a time between June 2002 and August 2002. One of the conditions for the children's being returned to Nona at that time was that they were not to live in the home of Nona's mother, from which they had been removed. To Carver's knowledge, the children were never placed on the reservation. Carver testified that before the 1998 case closed in December 2002, there were a number of contacts with the tribe in 1998 and 2000, but that the tribe did not attempt to intervene.

Carver testified that within the month prior to the June 3, 2004, hearing on the tribe's requests to intervene in the cases at hand, she had talked with Provost regarding intervention and learned that Provost intended to place custody of the children with Nona's brother in South Dakota. Carver was aware that Nona had taken the children to the reservation, but that they had not lived there for a significant period of time. (When asked whether she was aware that the children were on the reservation for a few days, Carver answered, "Yes.")

Following the arguments of counsel and the guardian ad litem, the court stated:

> In this case the Court finds good cause to retain jurisdiction on this case considering all of the — totality of the circumstances of the case. This is the second abuse and neglect petition filed under authority of the Juvenile Act, under the aspects of the Juvenile Act that would apply to this case, and I find [Nona's] testimony here to be dubious because if she had . . . any real intentions of doing all the things that she said she was going to do she had a lot of years to be implementing some of them and didn't implement any of them.

The court expressed its belief that no adjudication would take place if the cases were transferred to tribal court and stated, "If

this request for transfer were truly made in good faith perhaps it would be best made after an adjudication and before a disposition because a request to transfer can be made at any stage in the proceedings." In journal entries filed July 6, 2004, the court denied the requests to transfer jurisdiction to the tribe and ordered that the Scotts Bluff County Court retain jurisdiction of the matters. Nona timely appeals.

## ASSIGNMENT OF ERROR

Nona alleges that the trial court erred in denying the motion to transfer jurisdiction under the ICWA and that the denial should be treated as a final, appealable order.

## STANDARD OF REVIEW

■■■ Cases arising under the Nebraska Juvenile Code are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the trial court's findings. *In re Interest of Destiny S.*, 263 Neb. 255, 639 N.W.2d 400 (2002). In reviewing questions of law arising in such proceedings, an appellate court reaches a conclusion independent of the lower court's ruling. *Id.* A jurisdictional question which does not involve a factual dispute is determined by an appellate court as a matter of law. *In re Interest of Anthony R. et al.*, 264 Neb. 699, 651 N.W.2d 231 (2002).

## ANALYSIS

*Jurisdictional Question.*

■■■ Nona appeals from preadjudication orders denying a transfer of the matters to tribal court. In a juvenile case, as in any other appeal, before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it. *Id.* For an appellate court to acquire jurisdiction of an appeal, there must be a final order entered by the court from which the appeal is taken; conversely, an appellate court is without jurisdiction to entertain appeals from nonfinal orders. *Id.* In *Matter of Appeal in Maricopa County, Juvenile Action No. JD-6982*, 186 Ariz. 354, 922 P.2d 319 (Ariz. App. 1996), the mother argued in her response brief that the denial of a motion to transfer jurisdiction to a tribal court was an unappealable order, but, without discussion, the appellate court ruled that the order was final and appealable.

In Nebraska, the three types of final orders which may be reviewed on appeal are (1) an order which affects a substantial right and which determines the action and prevents a judgment, (2) an order affecting a substantial right made during a special proceeding, and (3) an order affecting a substantial right made on summary application in an action after judgment is rendered. Neb. Rev. Stat. § 25-1902 (Reissue 1995); *Webb v. American Employers Group*, 268 Neb. 473, 684 N.W.2d 33 (2004). We can easily eliminate the first and third categories—the order at issue did not determine the action, nor was it made on summary application after the entry of a judgment. Orders which fall into the second category of § 25-1902 must meet two requirements: A substantial right must be affected, and the court's order must be made in a special proceeding. *Michael B. v. Donna M.*, 11 Neb. App. 346, 652 N.W.2d 618 (2002). A substantial right is an essential legal right, not a mere technical right. *In re Interest of Anthony R. et al., supra.* A proceeding before a juvenile court is a "special proceeding" for appellate purposes. *In re Interest of Ty M. & Devon M.*, 265 Neb. 150, 655 N.W.2d 672 (2003). Thus, we must consider the nature of the court's orders retaining jurisdiction and refusing to transfer jurisdiction to the tribal court, and what parental rights, if any, were affected by the orders.

In *In re Interest of Clifford M. et al.*, 258 Neb. 800, 606 N.W.2d 743 (2000), the State filed a motion to terminate the mother's parental rights and the mother moved to dismiss the State's motion on the ground that the motion was based on an improper retroactive application of a statutory amendment. The juvenile court denied the motion. Upon appeal, the Nebraska Supreme Court stated that to the extent there could be merit to the mother's motion to dismiss, the substance of her challenge to the application of the statute as amended could be preserved at the termination hearing and considered on appeal therefrom. The court therefore reasoned that the denial of the mother's motion to dismiss did not dispose of the whole merits of the case, that the case remained pending in the juvenile court for further action, and that the order did not affect a substantial right and was not a final order for purposes of appeal.

In *In re Interest of R.G.*, 238 Neb. 405, 470 N.W.2d 780 (1991), the Nebraska Supreme Court held that a preadjudication

order granting continued detention of a child affects a parent's substantial right. In *In re Interest of R.G.*, the court noted that there was no question that both the ex parte temporary detention order and the later detention order interfered with the mother's rights in her infant daughter. The court stated, "[T]he question of whether a substantial right of a parent has been affected by an order in juvenile court litigation is dependent upon both the object of the order and the length of time over which the parent's relationship with the juvenile may reasonably be expected to be disturbed." *Id.* at 415, 470 N.W.2d at 788. The *In re Interest of R.G.* court ultimately concluded that the ex parte temporary detention order was nonfinal and not appealable, but that the later detention order was a final, appealable order. (We note that one statute in effect at the time *In re Interest of R.G.* was decided, Neb. Rev. Stat. § 43-278 (Reissue 1988), specified that an adjudication hearing had to be held no later than 6 months after the petition was filed. Thus, a parent could lose up to 6 months of time with the child if the parent had to wait until after an adjudication hearing to appeal. That statute now requires that the adjudication hearing be held within 90 days of the filing of the petition.) On the other hand, the Nebraska Supreme Court has also held that an order denying continued detention of a juvenile prior to adjudication does not affect a substantial right of the State. *In re Interest of Anthony G.*, 255 Neb. 442, 586 N.W.2d 427 (1998).

■ A substantial right is affected if an order affects the subject matter of the litigation, such as diminishing a claim or defense that was available to the appellant prior to the order from which he or she is appealing. *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000). In *State v. Schlund*, 249 Neb. 173, 542 N.W.2d 421 (1996), the issue on appeal was whether an order granting a motion to disqualify the defendant's counsel was a final, appealable order. The defendant argued that her right to counsel was a substantial right affected by the grant of the motion to disqualify, and the Nebraska Supreme Court acknowledged that a criminal defendant has a Sixth Amendment right to effective assistance of counsel. The court stated that a defendant does not, however, have a constitutional right to counsel of his or her choice when counsel is court appointed and that because the *Schlund* defendant's counsel was court appointed, said counsel's

disqualification did not affect the defendant's alleged " 'substantial right' to counsel." *Id.* at 176, 542 N.W.2d at 423. The court reasoned that the grant of the motion

> affect[ed] the peripheral matter of the counsel qualified to represent the defendant, rather than affecting the subject matter of the case; thus, under the *Jarrett* [*v. Eichler*, 244 Neb. 310, 506 N.W.2d 682 (1993),] definition of substantial right, the [grant of the] motion to disqualify [was] not a final order.

*Schlund,* 249 Neb. at 176, 542 N.W.2d at 423.

In *Holste v. Burlington Northern RR. Co.*, 256 Neb. 713, 592 N.W.2d 894 (1999), the Nebraska Supreme Court cited a number of cases wherein the court held that an order overruling a special appearance was not a final order from which an appeal could be taken. The *Holste* court noted that the U.S. Supreme Court had drawn a clear distinction between the right to be free from litigation in a particular forum and the right not to be subject to a binding judgment from such a forum, and that the right protected by the Due Process Clause is the right not to be subject to a binding judgment. The *Holste* court concluded that the overruling of a special appearance contesting personal jurisdiction on due process grounds did not affect a substantial right because the right not to be bound by a judgment can be vindicated in an appeal from the final judgment and is not a substantial right for the purpose of determining the appealability of an order.

In *Webb v. American Employers Group*, 268 Neb. 473, 481, 684 N.W.2d 33, 41 (2004), the Nebraska Supreme Court stated that the denial of a motion to compel arbitration clearly affected a substantial right because it prevented the appellant "from enjoying the contractual benefit of arbitrating the dispute between the parties as an alternative to litigation." The *Webb* court stated that the order denying the appellant's motion to compel "was not merely a step or a proceeding within the overall action. Instead, the motion sought to completely halt the pending lawsuit and 'transfer' the dispute to a nonjudicial forum as a matter of contractual right." 268 Neb. at 482, 684 N.W.2d at 41. The court further noted that a direct appeal from an order denying a motion to compel arbitration allows for "final resolution of the issue of arbitrability without having to first conclude a judicial proceeding on

the merits, at which point the arbitral remedy would be rendered essentially meaningless." *Id.* at 482, 684 N.W.2d at 42.

Similarly, the request to transfer jurisdiction in the instant case is not merely a step or a proceeding within the overall action. If the request were granted, the pending proceedings would stop and these matters would be transferred to another forum. While a tribal court in some respects may resemble a judicial forum based on Anglo-Saxon judicial traditions, it may differ in other respects consistent with the tribal court's Native American traditions. As contrasted with a request to transfer venue from one county or district court to another, we consider a request to transfer from a juvenile court to tribal court more analogous to a motion seeking arbitration in lieu of litigation, as in *Webb, supra.*

Further, in adopting the ICWA, the Legislature determined that Nebraska public policy should "cooperate fully with Indian tribes in Nebraska in order to ensure that the intent and provisions of the federal [ICWA] are enforced." Neb. Rev. Stat. § 43-1502 (Reissue 2004). In the federal act, Congress recognized the special relationship between the United States and the Indian tribes and the federal responsibility to Indian people; Congress found, inter alia, that (1) there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children; (2) the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe; (3) an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies; (4) an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions; and (5) the states, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families. 25 U.S.C. § 1901 (2000). These findings emphasize Congress' determination that a tribal court may provide the parent and the child with significant advantages inherent in the recognition and implementation of Native American customs and traditions. We also note that in the instant cases, DHHS took temporary custody of the children on

March 9, 2004, and the children will continue in out-of-home placements pending an adjudication hearing. We conclude that the trial court's orders denying the requests to transfer jurisdiction affected a substantial right in a special proceeding and were, therefore, final, appealable orders.

*Denial of Transfer.*

 Next, we must consider whether the trial court properly denied transferring the cases to the tribal court. Under the federal ICWA, a tribe has the right to seek a transfer of jurisdiction to the tribal courts for foster care placement proceedings or for termination of parental rights proceedings, and a juvenile court is required to transfer the case in the absence of good cause to deny the motion. 25 U.S.C. § 1911(b) (2000). Although the federal ICWA does not define good cause, the Bureau of Indian Affairs published nonbinding guidelines for determining whether good cause exists. Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584, 67,591 (Nov. 26, 1979) (not codified), state in part:

C.3. Determination of Good Cause to the Contrary

(a) Good cause not to transfer the proceeding exists if the Indian child's tribe does not have a tribal court as defined by the [federal ICWA] to which the case can be transferred.

(b) Good cause not to transfer the proceeding may exist if any of the following circumstances exists:

(i) The proceeding was at an advanced stage when the petition to transfer was received and the petitioner did not file the petition promptly after receiving notice of the hearing.

(ii) The Indian child is over twelve years of age and objects to the transfer.

(iii) The evidence necessary to decide the case could not be adequately presented in the tribal court without undue hardship to the parties or the witnesses.

(iv) The parents of a child over five years of age are not available and the child has had little or no contact with the child's tribe or members of the child's tribe.

(c) Socio-economic conditions and the perceived adequacy of tribal or Bureau of Indian Affairs social services or judicial systems may not be considered in a determination that good cause exists.

The commentary section following the above guidelines states: "Application of th[e] criterion [in subsection (b)(iii) above] will tend to limit transfers to cases involving Indian children who do not live very far from the reservation."

 The party opposing the transfer has the burden of establishing that good cause not to transfer the matter exists. See *In re Interest of C.W. et al.*, 239 Neb. 817, 479 N.W.2d 105 (1992). That a state court may take jurisdiction does not necessarily mean that it should do so, as the court should consider the rights of the child, the rights of the tribe, and the conflict of law principles, and should balance the interests of the state and the tribe. *Id.* Based upon *In re Interest of C.W. et al.*, it appears that the denial of a transfer to tribal court is reviewed for an abuse of discretion.

As recognized in *In re Interest of C.W. et al.*, one element of the nonbinding guidelines used to deny transfer to tribal court upon the basis of good cause is considerations of forum non conveniens.

> In determining whether the doctrine of forum non conveniens should be invoked, the trial court should consider practical factors that make trial of the case easy, expeditious, and inexpensive, such as the relative ease of access to sources of proof, the cost of obtaining attendance of witnesses, and the ability to secure attendance of witnesses through compulsory process. *Matter of Wayne R.N.*, 107 N.M. 341, 757 P.2d 1333 (N.M. App. 1988).

*In re Interest of C.W. et al.*, 239 Neb. at 828, 479 N.W.2d at 113.

Neither Nona nor her children were living on the reservation at the time the relevant petitions were filed. Nona had lived in Scotts Bluff County since 1984, and it appears that the children have lived in the Scottsbluff area for most of their lives. An officer with the Scottsbluff Police Department testified that witnesses needed to present the case included Carver, a DHHS employee other than Carver who also helped remove the children, and a counselor at the school. Presumably, all these witnesses and other evidence are located in Scotts Bluff County. Provost testified that it is about "two hours" from the courthouse in Scottsbluff to the Oglala tribal court. The testimony regarding whether there was a mechanism to subpoena witnesses to appear in the tribal court was unclear, although the tribal court clerk apparently sends out "notices" a couple of weeks prior to a court

date. When asked whether the trial court could call witnesses from other states, Provost testified, "Not in any of my cases that I've worked with whether it be social services or ONTRAC." We also observe the lack of intervention by the tribe in the prior juvenile proceedings involving these children. Because (1) the family was not domiciled on the reservation, (2) transfer of jurisdiction was not mandatory, and (3) good cause for retaining jurisdiction existed, we cannot conclude that the trial court abused its discretion in declining to transfer jurisdiction over these matters to the tribal court.

## CONCLUSION

We conclude that the orders denying a transfer of the cases to tribal court were final and appealable orders. We further conclude that the trial court did not abuse its discretion in retaining jurisdiction over these matters.

AFFIRMED.