district court did not abuse its discretion in granting the State's motion to consolidate. Accordingly, we affirm Clark's conviction and sentence.

Affirmed.

---

In re Interest of Shane L. et al.,
children under 18 years of age.
State of Nebraska, appellee and cross-appellee,
v. Amanda L., appellant, and Cameron L.,
appellee and cross-appellant.
___ N.W.2d ___

Filed December 31, 2013.    Nos. A-13-380 through A-13-383.

1. **Juvenile Courts: Judgments: Appeal and Error.** Cases arising under the Nebraska Juvenile Code are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the trial court's findings. In reviewing questions of law arising in such proceedings, an appellate court reaches a conclusion independent of the lower court's ruling.
2. **Jurisdiction: Appeal and Error.** A jurisdictional question which does not involve a factual dispute is determined by an appellate court as a matter of law.
3. ____: ____. Before reaching the legal issues presented for review, an appellate court must determine whether it has jurisdiction.
4. **Final Orders: Appeal and Error.** There are three types of final orders that may be reviewed on appeal: (1) an order which affects a substantial right and which determines the action and prevents a judgment, (2) an order affecting a substantial right made during a special proceeding, and (3) an order affecting a substantial right made upon summary application in an action after a judgment is rendered.
5. **Indian Child Welfare Act: Jurisdiction: Final Orders.** An order denying a transfer of a case to tribal court affects a substantial right in a special proceeding and is, therefore, a final, appealable order.
6. **Jurisdiction: Final Orders: Time: Notice: Appeal and Error.** In order to vest an appellate court with jurisdiction, a notice of appeal must be filed within 30 days of the entry of the final order.
7. **Final Orders: Time: Appeal and Error.** If a party fails to timely perfect an appeal of a final order, he or she is precluded from asserting any errors on appeal resulting from that order.
8. **Parental Rights: Proof.** To terminate parental rights, the State must prove by clear and convincing evidence that one or more of the statutory grounds listed in Neb. Rev. Stat. § 43-292 (Cum. Supp. 2012) have been satisfied and that termination is in the child's best interests.

9. **Indian Child Welfare Act: Parental Rights: Proof: Expert Witnesses.** Under the Nebraska Indian Child Welfare Act, in addition to the statutory grounds listed in Neb. Rev. Stat. § 43-292 (Cum. Supp. 2012), the State must prove two more elements before terminating parental rights in cases involving Indian children. First, the State must prove by clear and convincing evidence that active efforts have been made to prevent the breakup of the Indian family and that these efforts have proved unsuccessful. Second, the State must prove by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

10. **Indian Child Welfare Act.** The heightened standard applicable to certain elements of the Nebraska Indian Child Welfare Act is not applicable to all elements.

11. **Indian Child Welfare Act: Parental Rights: Proof.** In a case arising under the Nebraska Indian Child Welfare Act, the standard by which the State must prove that terminating parental rights is in the child's best interests is clear and convincing evidence, not beyond a reasonable doubt.

12. **Parental Rights.** When a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the child's best interests require termination of parental rights.

13. ____. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity.

14. **Appeal and Error.** Errors argued but not assigned will not be considered on appeal.

Appeal from the County Court for Box Butte County: RUSSELL W. HARFORD, Judge. Affirmed.

Dave Eubanks, Box Butte County Public Defender, for appellant.

Kathleen J. Hutchinson, Box Butte County Attorney, for appellee State of Nebraska.

Dave Eubanks, Box Butte County Public Defender, for appellee Cameron L.

Pamela Epp Olsen, of Cline, Williams, Wright, Johnson & Oldfather, L.L.P., guardian ad litem.

INBODY, Chief Judge, and MOORE and RIEDMANN, Judges.

RIEDMANN, Judge.

## INTRODUCTION

The county court for Box Butte County, sitting as a juvenile court, terminated the parental rights of Cameron L. and

Amanda L. to their children, Shane L., Lena L., Hanna L., and Jadys L. The children are Indian children as defined by statute, and thus, the Nebraska Indian Child Welfare Act (NICWA) is applicable in this case. Cameron and Amanda argue that the juvenile court erred in denying the motion to transfer the case to tribal court and in finding that terminating their parental rights was in the children's best interests. For the reasons that follow, we affirm.

## BACKGROUND

Cameron and Amanda are the parents of Shane, born in 2003; Lena, born in 2004; Hanna, born in 2007; and Jadys, born in 2008. This case is governed by NICWA, Neb. Rev. Stat. §§ 43-1501 through 43-1516 (Reissue 2008), because Cameron is an enrolled member of the Oglala Sioux Tribe and his children are eligible for enrollment.

In August 2009, Shane, Lena, Hanna, and Jadys were removed from Cameron and Amanda's care after police were called to the home and observed that both parents were intoxicated, the home was extremely filthy, and the children had unaddressed medical needs. The State filed a petition alleging that the children came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008) due to the faults or habits of Cameron and Amanda. The children were placed with their maternal grandmother under the supervision of the Nebraska Department of Health and Human Services (DHHS). Cameron and Amanda were each charged with felony child abuse as a result of the situation in which their children were found, but the charges were reduced to misdemeanors on the condition that Cameron and Amanda admit the allegations in the juvenile proceedings. They did so, and the children were adjudicated under § 43-247(3)(a).

The children remained in their grandmother's care until August 2011, when they were removed because there were at least 10 to 15 people living in the home, well over capacity; their grandmother was allowing Cameron and Amanda unsupervised parenting time with the children; and the children had severe untreated head lice. Hanna and Jadys were placed with their current foster parents. Shane and Lena were initially

placed with different foster parents, but in May 2012, they were also placed with Hanna and Jadys' foster parents.

Because the children were eligible for enrollment in the Oglala Sioux Tribe, DHHS sent notice to the tribe, pursuant to NICWA, in September 2009, that petitions involving these children had been filed. Notices were also sent at each stage of the juvenile proceedings, including sending case plans, court reports, and progress letters. On March 15, 2012, the Oglala Sioux Tribe moved to intervene in the case and transfer jurisdiction to the tribal court. On May 8, 2012, Cameron and Amanda also filed motions to transfer the cases to tribal court. A hearing was held that day, and the court orally granted the tribe's motion to intervene without objection. In a subsequent written order dated July 1, 2012, the juvenile court found that good cause existed not to transfer jurisdiction to the tribal court and denied the motions to transfer.

On November 7, 2012, the State filed a motion to terminate Cameron's and Amanda's parental rights to Shane, Lena, Hanna, and Jadys. The termination hearing was held on January 28, 2013. The evidence revealed that DHHS has been involved with Cameron and Amanda since 2006. In total, DHHS has received 33 allegations that Cameron and/ or Amanda had physically neglected or abused their children, and of those 33 claims, 10 were substantiated by the court and 4 were substantiated by DHHS. Shane and Lena were first removed from their parents' care in July 2006, before the younger children were born, due to neglect. They were adjudicated under § 43-247(3)(a) at that time, but jurisdiction of the case was transferred to the tribal court, which returned custody of Shane and Lena to Cameron and Amanda.

Shane, Lena, Hanna, and Jadys were then removed from Cameron and Amanda's care in August 2009 pursuant to these cases. The initial case plan outcomes included that Cameron and Amanda maintain sobriety and that they provide basic needs for their children, including a safe and sanitary home. Cameron and Amanda never made significant progress on either outcome.

Amanda completed a pretreatment assessment at the North Eastern Panhandle Substance Abuse Center (NEPSAC) on

October 15, 2009. The recommendation was that she participate in short-term residential treatment for her alcohol dependence, and she entered such a program at NEPSAC on November 4. She was successfully discharged on December 14 and was noted to have made "slight progress," although her prognosis was described as "'guarded.'" Despite this progress, Amanda was arrested on January 1, 2010, and admitted she had been drinking.

Cameron was referred to NEPSAC for an evaluation, and it was recommended that he also complete a short-term residential treatment program. He entered the program at NEPSAC on January 7, 2010, but left against staff advice 3 days later.

After these initial attempts at treatment through NEPSAC, DHHS arranged and paid for additional evaluations for both Cameron and Amanda at a mental health center and a rehabilitation services company. Both evaluations recommended short-term residential treatment. DHHS contacted several treatment facilities in the area and assisted Cameron and Amanda in completing applications. They were unable to find a facility willing to accept them, however, because their needs were too high and because they had not cooperated with treatment in the past. Specifically, NEPSAC would not accept Amanda because additional testing concluded that she was "borderline mentally retarded." Another facility refused to accept Cameron because it was determined that he had not been truthful on his evaluation.

Although DHHS workers and the children's guardian ad litem repeatedly stressed the importance of addressing Cameron's and Amanda's alcohol issues, neither parent expressed a strong desire to attend treatment or to take the idea seriously. During team meetings, they both reacted negatively to the idea of treatment and believed "they were being made to go." They viewed treatment as a waste of time and laughed at the idea. Yet, their alcohol use continued to cause problems in their lives.

In January and February 2012, Amanda was hospitalized with lacerations to her forearms and suicidal ideations. She was intoxicated upon admission on both occasions. Despite this, on February 23, 2012, Amanda indicated to a visitation aide that

a 6- to 9-month treatment program was longer than she was willing to commit to.

Additionally, as a result of their alcohol use, Cameron and Amanda continued to violate the law. During the pendency of the case, Cameron was convicted of driving under suspension, obstructing a peace officer, trespassing, disturbing the peace twice, and driving under the influence twice. During that same time, Amanda was also convicted of driving under the influence and disturbing the peace twice. To date, neither Cameron nor Amanda has completed additional alcohol treatment.

Cameron and Amanda's other case plan outcome was to obtain the ability to provide for their children's basic needs, including a safe and sanitary home. The evidence presented at the termination hearing established that Cameron and Amanda were not able to secure stable housing for a consistent period of time, despite assistance from DHHS. In September 2010, Cameron and Amanda moved into an apartment. They lost the apartment, however, when the owner went into bankruptcy.

In May 2011, Cameron and Amanda moved into a trailer, which the support worker helped them repair so it would be suitable for visitation with the children. They were evicted a few months later, however, because Cameron was incarcerated and Amanda was unable to pay the rent on her own. Despite aid from the support worker to find a new residence, they were unable to do so. They applied for housing assistance but were denied because of their criminal records. At various times during the case, Cameron and Amanda lived with Amanda's mother or stayed with other family members or friends.

Neither parent was able to secure steady employment. The support worker took Cameron and Amanda to pick up job applications, helped complete the applications and return them, and informed them of job openings. The support worker also took them to sign up for "GED classes," but because there were people in the classes that Cameron did not like, they never attended any classes.

Although Cameron was not able to find consistent or full-time employment, he has worked periodically for the past 6 years for a local farmer, earning approximately $5,700 in

2012. Amanda also worked briefly at a hotel for 2 weeks in August 2011. At the time of the termination hearing, their situation had slightly improved. Cameron testified that Amanda was receiving "social security disability" benefits of $478 per month and that the amount was set to increase to $710 per month as of February 1, 2013. They were also receiving $400 per month in food stamps. At the time, they were living in a trailer, which they paid for using Amanda's disability benefits.

The DHHS case manager testified at the termination hearing that Cameron and Amanda had not completed any of the case plan goals that had been in place for over 3 years. She recounted much of the above history, including the assistance that DHHS provided to Cameron and Amanda to help them meet their case outcomes. She testified that the children are thriving in foster care and described them as "doing amazingly well." She noted that the current foster placement is a potential adoptive home for all four children and that the foster family has formulated a cultural plan to address the children's Native American heritage. In her opinion, Cameron's and Amanda's parental rights should be terminated because they had not made sufficient progress with their case plan, they had not found stable employment, they violated court orders throughout the pendency of the case, and they had not addressed their alcohol issues.

Jeanna Townsend, a licensed mental health practitioner and certified professional counselor, also testified at the termination hearing. She began providing counseling services to Shane and Lena in March 2012 and to Hanna and Jadys in April 2012. She generally sees the children every other week. All four children have been diagnosed with fetal alcohol syndrome, which occurs when a fetus is exposed to such a high quantity of alcohol that its development is affected. Townsend testified that all of the children seem to have some developmental delay, which can be attributed to their fetal alcohol syndrome and the environment in which they were raised by their parents.

Townsend diagnosed Shane with "adjustment disorder with disruption of mood and conduct." This diagnosis means that

when he is exposed to a stressor—for example, a chaotic environment—he has a "mal-adjusted response," meaning he might become chaotic in behavior, become depressed or aggressive, become anxious, or worry. Townsend diagnosed Lena with "adjustment disorder, with mixed depression and anxiety," and the two younger girls were diagnosed with adjustment disorder which cannot be associated with mood, conduct, or anxiety due to their young ages.

According to Townsend, predictability and stability are of the utmost importance for children who have fetal alcohol syndrome and an adjustment disorder. Safety, structure, routine, and predictability are vitally important because that is how they develop trust and comfort from their environment. Chaos tends to trigger "insecurities and behaviors," and halts their development because it puts them in "panic mode."

Townsend testified that Shane, Lena, Hanna, and Jadys have "flourished" in foster care since visitation with their parents ended in July 2012, and she attributed that improvement to the lack of chaos in their lives. Townsend expressed great concern that reintroducing the relationship between the children and their parents would cause duress to the children, so much that they would not be able to develop as fully as they would in a stable environment. This was particularly concerning to her because the children are already developmentally delayed. In Townsend's opinion, the children would be at great risk of further developmental delay and emotional harm if they were placed back with their parents or any potential familial caregivers.

Townsend testified that the children have bonded with their foster family and that it would be detrimental to them if the bond was disrupted. The children have made tremendous improvements while living with their foster parents. According to Townsend, "[The children] like to live [with their foster parents]. They like to have the consistent routine, and they like to have food and to take baths, and to have rooms that they can help decorate. They like all of those things about having a home." All of the children have expressed to Townsend that they want to live with their foster parents.

In an order dated March 22, 2013, the juvenile court terminated Cameron's and Amanda's parental rights to Shane, Lena, Hanna, and Jadys. The court found that the State had met its burden to prove that statutory grounds for termination existed under Neb. Rev. Stat. § 43-292(2), (4), (6), and (7) (Cum. Supp. 2012). The court further found that the State had proved by clear and convincing evidence that active efforts were made by DHHS to provide family support services, but that those efforts were unsuccessful in reunifying Cameron and Amanda with their children. In addition, the court found beyond a reasonable doubt that substantial emotional harm would result to the children if they were returned to the care and custody of their parents. Finally, the court found that it was in the best interests of the children to terminate the parental rights of their parents. Amanda filed a timely notice of appeal. Cameron filed a second notice of appeal and is designated as an appellee asserting a cross-appeal pursuant to Neb. Ct. R. App. § 2-101(C) (rev. 2012). However, they filed a brief together, so for ease of discussion, they will be treated in this opinion as appellants. We note that the parties have stipulated to the consolidation of the cases for consideration on appeal.

## ASSIGNMENTS OF ERROR

Cameron and Amanda assign that the juvenile court erred in (1) denying transfer of the case to the tribal court and (2) finding that termination of their parental rights was in the children's best interests.

## STANDARD OF REVIEW

[1,2] Cases arising under the Nebraska Juvenile Code are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the trial court's findings. In reviewing questions of law arising in such proceedings, an appellate court reaches a conclusion independent of the lower court's ruling. *In re Interest of Enrique P. et al.*, 14 Neb. App. 453, 709 N.W.2d 676 (2006). A jurisdictional question which does not involve a factual dispute is determined by an appellate court as a matter of law. *Id.*

## ANALYSIS

*Transferring Jurisdiction*
*to Tribal Court.*

[3-5] Cameron and Amanda argue that the juvenile court erred in denying the motions to transfer jurisdiction of the case to the tribal court. Before reaching the legal issues presented for review, an appellate court must determine whether it has jurisdiction. *In re Interest of Jamyia M.*, 281 Neb. 964, 800 N.W.2d 259 (2011). There are three types of final orders that may be reviewed on appeal: (1) an order which affects a substantial right and which determines the action and prevents a judgment, (2) an order affecting a substantial right made during a special proceeding, and (3) an order affecting a substantial right made upon summary application in an action after a judgment is rendered. *Id.* We have previously determined that an order denying a transfer of a case to tribal court affects a substantial right in a special proceeding and is, therefore, a final, appealable order. See *In re Interest of Brittany C. et al.*, 13 Neb. App. 411, 693 N.W.2d 592 (2005).

[6,7] In order to vest an appellate court with jurisdiction, a notice of appeal must be filed within 30 days of the entry of the final order. *In re Interest of Jamyia M., supra.* See Neb. Rev. Stat. § 25-1912(1) (Reissue 2008). If a party fails to timely perfect an appeal of a final order, he or she is precluded from asserting any errors on appeal resulting from that order. See *In re Interest of Enrique P. et al., supra.*

In this case, Cameron and Amanda are asserting error from the juvenile court's order dated July 1, 2012, denying the motions to transfer the case to tribal court. Because neither party perfected an appeal within 30 days of entry of that order, we now lack jurisdiction to review Cameron and Amanda's argument that the case should have been transferred to tribal court.

*Best Interests.*

[8,9] Cameron and Amanda argue that the juvenile court erred in finding that terminating their parental rights was in the best interests of their children. To terminate parental rights, the State must prove by clear and convincing evidence

that one or more of the statutory grounds listed in § 43-292 have been satisfied and that termination is in the child's best interests. *In re Interest of Walter W.*, 274 Neb. 859, 744 N.W.2d 55 (2008). NICWA, however, adds two additional elements the State must prove before terminating parental rights in cases involving Indian children. First, the State must prove by clear and convincing evidence that active efforts have been made to prevent the breakup of the Indian family and that these efforts have proved unsuccessful. Second, the State must prove by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. See *id*.

We note that although Cameron and Amanda have not assigned any error with respect to statutory grounds for termination, active efforts, or emotional or physical damage, we have reviewed the record and find no plain error as to these elements. The State proved by clear and convincing evidence that termination of Cameron's and Amanda's parental rights was warranted under § 43-292(7). The State also proved by clear and convincing evidence that active efforts were made to prevent the breakup of this family, as evidenced by the numerous services provided to the family over a number of years, but that the efforts were unsuccessful. Finally, upon our de novo review of the record, we conclude that the State proved by evidence beyond a reasonable doubt, through Townsend's testimony, that continued custody of these children by their parents or Indian custodian was likely to result in serious emotional or physical damage to the children.

Cameron and Amanda claim that the State failed to present testimony of a qualified witness and that Townsend was not qualified as an expert, but they did not assign these claims as error, and we find no plain error in the juvenile court's qualification of Townsend as an expert witness. The Bureau of Indian Affairs has set forth guidelines under which expert witnesses will most likely meet the requirements of NICWA, which include, """A professional person having substantial education and experience in the area of his or her specialty."""

*In re Interest of Ramon N.*, 18 Neb. App. 574, 584, 789 N.W.2d 272, 281 (2010).

Townsend is a licensed mental health practitioner and certified professional counselor who has had her own private practice since 2000. Approximately two-thirds of her practice is devoted to working with abused or neglected children or those with behavioral problems. She has worked with Indian children in her practice. Before working as a counselor, Townsend worked at a youth shelter and at a high school program designed for parenting and pregnant teenagers. Through this work, she also worked with Indian youth. Accordingly, the juvenile court did not err in finding that Townsend was qualified to provide expert testimony, and her testimony was sufficient to prove that these children were at risk for emotional harm.

[10,11] As to their assignment of error, Cameron and Amanda challenge only the best interests element and claim that the State failed to prove beyond a reasonable doubt that termination was in the children's best interests. We note that Cameron and Amanda's argument indicates an incorrect understanding of the State's burden with respect to the best interests element. The heightened standard applicable to certain elements of NICWA is not applicable to all elements. See *In re Interest of Ramon N., supra.* The standard by which the State must prove that terminating parental rights is in the child's best interests is clear and convincing evidence, not beyond a reasonable doubt. See *id.* We conclude the State has met its burden of proof in this case.

Shane, Lena, Hanna, and Jadys were in an out-of-home placement for 39 months before the State filed the motion to terminate parental rights. During that time period, Cameron and Amanda failed to make substantial, sustained progress on their goals. While they obtained housing for short periods of time, they were unable to maintain it due to unemployment and incarceration. DHHS provided considerable assistance to Cameron and Amanda in attempting to find stable housing and employment, to no avail.

Additionally, and more important, Cameron and Amanda failed to address the most critical aspect of this case: their

alcohol abuse. Cameron and Amanda argue that their inability to complete alcohol treatment was because "the system failed them." Brief for appellants at 19. Although Amanda cannot be blamed for her low cognitive functioning, the other reasons that no facility would accept them can be directly attributed to their behaviors and attitudes. The fact that both parents had been previously unsuccessful in treatment was a reason that facilities refused to accept them. In addition, Cameron's dishonesty in his evaluation caused another facility to deny him. Even if a suitable facility had been located, neither parent indicated a willingness to enter treatment and take recovery seriously. As the juvenile court observed in its order, "Both [parents] thought alcohol treatment was a joke and laughed about it at team meetings . . . ." They continued to drink and violate the law, leading to multiple convictions and periods of incarceration for both parents.

The children are happy and flourishing in their current home and have all expressed a desire to remain with their foster parents. As Townsend noted, all children, but particularly those with fetal alcohol syndrome and adjustment disorders, need consistency, stability, and permanency. This does not appear to be possible with Cameron and Amanda. We recognize that Cameron and Amanda had shown slight improvement at the time of the termination hearing; however, they have failed to address the primary concern leading to their children's removal, which was their alcohol abuse, more than 3 years after their children's removal.

[12,13] When a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the child's best interests require termination of parental rights. *In re Interest of Walter W.*, 274 Neb. 859, 744 N.W.2d 55 (2008). Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *Id*. The evidence is clear that it is in the children's best interests that Cameron's and Amanda's parental rights be terminated.

[14] We note that Cameron and Amanda also assert that Wilson's testimony lacked sufficient foundation but do not assign this as error. Errors argued but not assigned will not be

considered on appeal. *Butler County Dairy v. Butler County*, 285 Neb. 408, 827 N.W.2d 267 (2013). We therefore decline to address this issue.

## CONCLUSION

We conclude that Cameron and Amanda failed to timely appeal from the orders denying the motions to transfer the cases to tribal court. As such, this court is without jurisdiction to address Cameron and Amanda's argument that the juvenile court erred in that respect. Upon our de novo review, we find that the State presented clear and convincing evidence that termination of Cameron's and Amanda's parental rights to Shane, Lena, Hanna, and Jadys was in the children's best interests. Accordingly, we affirm the orders of the juvenile court.

AFFIRMED.